(No. 17999.—Judgment affirmed.)
ARTHUR EDGAR LANDRY, Appellant, *vs.* EDWARD MORRIS,
Exr., Appellee.

*Opinion filed April 20, 1927.*

1. WILLS—*execution of will must meet statutory requirements.*
As the statute has defined what is necessary to the execution of a
valid will, courts cannot dispense with or add to requirements pre-
scribed by the statute, and unless the preponderance of the evi-
dence shows that the statutory requirements have been complied
with the will cannot be admitted to probate.

2. SAME—*when evidence is not sufficient to admit will to pro-
bate—attestation clause.* An attestation clause in proper form is
*prima facie* evidence of due execution of a will and in some cases
may prevail over the testimony of the subscribing witnesses; but it
is not conclusive, and where it does not recite that the testatrix
was of sound mind and memory, and the attesting witnesses tes-
tify that the testatrix was so ill as to be almost unconscious and
that they did not believe she was of sound mind or that they had
doubts of her being of sound mind, and further testify, contrary
to the recital of the attestation clause, that the chief beneficiary,
and not the testatrix, asked them to witness the will, the evidence
is insufficient to admit the will to probate.

3. SAME—*when evidence of mental condition before and after
execution of will is competent.* Mere weakness from disease at
the time of the execution of a will will not render it invalid where
the mind is sufficiently clear to understand what is being done, and
where the alleged will was executed during a severe and last ill-
ness it is competent to prove the mental condition of the testatrix
during such illness, prior and subsequent to the making of the will.

APPEAL from the Circuit Court of Cook county; the
Hon. KICKHAM SCANLAN, Judge, presiding.

PEDEN, KAHN & MURPHY, (GERALD RYAN, of coun-
sel,) for appellant.

GEORGE H. MASON, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook county denying admission to probate of the alleged last will of Mary A. McGrath, executed by her on September 23, 1925. Probate of the will was denied by the probate court, and Arthur E. Landry, the executor named therein, appealed to the circuit court.

Mary A. McGrath executed a will in May, 1925, which instrument has been admitted to probate as her last will and testament. She was a married woman, but so far as the record shows had no child or children. She lived in her own building. Appellant and his wife and two university students roomed in the building also. Testatrix was ill with diabetes most of the year 1925 and was under the care of a practical nurse from April to August of that year, when she went to a hospital. She returned home from the hospital about September 18, 1925, and remained there until her death, which occurred October 1, 1925. The will executed by her in May, 1925, was not introduced in evidence, but from the briefs of the parties it appears to have made a different disposition of the property from the will here under consideration, which is alleged to have been executed September 23, 1925. The testatrix left real estate of the value of $14,000 and about $300 worth of personal property. It does not appear from the record who were her heirs, if she left any. The will of September 23, 1925, revokes all former wills, and, after making bequests of personalty, provides the residue of her estate to be distributed one-third to John Hanifin and two-thirds to appellant, Arthur E. Landry. Appellant was appointed executor and given power to sell the real and personal estate at private sale and distribute the proceeds. So far as the record shows, neither the devisee, Hanifin, nor appellant, Landry, was related to the testatrix. Someone,—it does not appear who,—requested William J. Flaherty, a lawyer, September 22, 1925, to go to the home of the testatrix. He

went to her house on that day, talked over with her the making of her will, returned to his office and dictated it to a stenographer. Next day he gave it to Herbert J. Theisen, a young lawyer employed in his office, to take to the testatrix for her to execute.

It is appellant's contention that all the statutory requirements for the execution of a valid will were complied with and that the court erred in not admitting it to probate. It is appellee's position that the proof did not show the testatrix was of sound mind when the will was executed or that she was conscious of what she was doing at the time.

The alleged will was signed by Theisen and a nurse, Lena Frederick, as witnesses. Theisen testified he was a lawyer associated with Flaherty's firm, and that he signed the will as a witness at the home of the testatrix the day it bears date. He took it to her home at the suggestion of Flaherty. Appellant was there. The testatrix was in bed. Witness told appellant he wanted to read the will, and understood him to say, "She won't know you, and it won't do any good." Then appellant took the will to the bed, held it up so the testatrix could see, and said, "Mayme, I have the will, and is it all right? Do you want to sign it?" The testatrix said, "Yes; you will have to raise me to a sitting position, though." The will was placed before her, and she was so weak appellant asked if it would be all right for her to make a cross. Witness held her elbow and steadied it and appellant held his hand over her hand. The pen was placed in her hand and appellant guided it in making the signature. Witness signed the will at the request of appellant. He could not say whether the testatrix heard appellant ask him to sign it. The nurse had signed it before witness did. Witness believed the testatrix was of sound mind at the time she signed the will because she asked to be placed in a sitting position to sign the instrument. Witness could not say whether she knew what was going on or not. She could not hold the pen without help. Just as

witness had written the letter "H" of his name there was some commotion and the nurse yelled, "Get out!" He ran to the rear of the apartment and while out there finished signing his name. He then went back to the room and handed the will to appellant, who gave it back to witness and witness took it to his office. He was in the rear of the apartment about five minutes, during which time he heard the testatrix moaning and groaning, but when he came back all was quiet. He saw her for just a second as he handed the will through the door. When he started to sign the will in the bed-room of the testatrix she said to bring the will and she would sign it, and appellant said, "Why, Mayme, you did sign it," and after that she was speechless. Witness testified as he made the letter "H" he had his doubts. He testified the testatrix was quite sick, and he did not know what happened in her room while he was in the rear of the apartment.

Lena Frederick, the nurse who signed as a witness, testified the testatrix signed the will with assistance. They raised her up in bed and appellant took her hand and traced her name. The testatrix was very ill. When Theisen brought the will to the house appellant went to her bedside with the will and said, "Mayme, this is the will; do you want to sign it the way it was written up the other night?" and she said, "Yes." She testified the testatrix had diabetes and was practically in a coma at the time. Witness thought she was unconscious, but when spoken to directly she would answer. She said she testified on the hearing in the probate court that the testatrix had only half-minute intervals of consciousness at a time, and then the testatrix was asked if she knew what she was doing, and she said, "Yes," and when asked, "Do you want this document signed as it is?" she replied, "Yes." The testatrix did not ask witness to sign the will, but she did sign at the request of appellant. The testatrix did not read the will. She was in no condition to do so and it was not

read over to her. Nothing was said as to what it contained. Witness admitted testifying in the probate court that during the half-minute period when the testatrix signed the will she knew what she was talking about. Upon cross-examination witness testified she was doubtful as to whether the testatrix was of sound mind when witness signed. The testatrix was very near to a state of unconsciousness which was not exactly coma. She would go from consciousness to unconsciousness, and if spoken to responded. She corroborated Theisen's testimony as to what appellant said to the testatrix about signing the will, their raising her up in bed and appellant holding her hand and tracing her name, and that he asked both the witness and Theisen to sign as witnesses. This was about three o'clock in the afternoon. Witness came to the testatrix's room about two o'clock. The testatrix had a heart attack and witness thought she was dying. About a half hour afterwards Theisen brought the will. After the testatrix was laid down in bed she seemed unconscious of what passed on about her. Appellant held the testatrix up while witness signed, but the testatrix gave no evidence of hearing. Witness had never seen James Posey, Mrs. Thomson or Mrs. Callahan talk with the testatrix after she signed the will. After the will was signed and before her death the testatrix would answer a direct question.

Mrs. Thomson, a witness in behalf of appellant, testified she is a practical nurse and knew the testatrix for five months and worked for her as a nurse. Witness prepared her food, took care of her business and paid her taxes at her request; also at her request arranged a loan on her note. Appellant and his wife lived with the testatrix and James Posey and a man by the name of Gregory were roomers in her house. Witness called on her September 23, 1925. Mrs. Callahan told the testatrix Mrs. Thomson was there. She was half sitting up in bed. She spoke to witness, calling her by name, and witness asked her how she

was feeling. She said, "Not very well." That was about one o'clock in the afternoon. She had just received communion. The regular nurse then came in and made a fuss, saying the testatrix was going to die. Mrs. Landry told her not to talk so loud. They got the testatrix quiet and witness told the nurse she would leave, and it was a few minutes before two o'clock. On that day the testatrix acted like she always did and was quite herself. She was of as sound mind on September 23, 1925, as she ever had been at any time witness had been with her. Next day witness returned to the testatrix as a practical nurse, and while she was there a lady from New York, who had not seen deceased for years, came in and the testatrix shook hands with and recognized her. Her mental condition was very keen that day. She heard her tell appellant's wife she had left everything the way she wanted it, and that she owed Mrs. Thomson eight dollars. Witness testified to a circumstance occurring three days later when the testatrix's mind was sound, and that from September 23 until she died she was very keen, realizing everything.

James Posey, a student in the Chicago University, who roomed at the testatrix's house, testified he saw her when she came from the hospital and every day thereafter until she died. She always recognized him and called him "Jimmie." He told of a circumstance occurring four or five days after she came to her home from the hospital, about his board, in which she talked intelligently. The Saturday before her death she recognized him and a school chum, calling them by name, and they had a talk and joked her about going "cabereting." They talked and laughed together half an hour. The day after the will was signed she recognized witness and told him Mrs. Thomson was back, and seemed quite cheerful. He said September 22, 23 and 24 she was of sound mind and memory.

Lillie Callahan testified she was a tenant in the testatrix's building a year and a half prior to the time she died.

She saw her the evening she came from the hospital and every day thereafter. She saw her on September 23 and didn't observe any difference in her after she came back from the hospital. She was the same as she always had been, mentally.

Rebecca Christy testified for proponent that she lived just back of the testatrix's house and was her tenant for a year. She talked to the testatrix after she came back from the hospital, prepared her food and would cheer her up. About September 21 she told witness she had an offer to sell her property, but the purchaser wanted to pay only $1000 down and she didn't think she ought to sell with such a small payment. Witness advised her not to, and told her to consult Laube, a real estate man. She was of sound mind September 23, 1925. Witness never saw her having a sinking spell.

Edward C. Laube testified for proponent that he lived across the alley from the testatrix and knew her for over three years. He was a witness to the will she executed in May, 1925. He saw her four or five times after she came home from the hospital and she always recognized and talked with him. Two or three days after she returned home from the hospital she consulted him about the sale of her property and said she could sell it if she would take $1000 cash. He told her not to sell at that figure. She knew what she was talking about. He saw her nearly every day. She was quite sick, but was of sound mind and memory during all that period.

We have endeavored to set out the material substance of all the testimony. The determination whether the statutory requirements for the valid execution of a will have been complied with must depend upon the evidence. The most important question is whether the deceased possessed testamentary capacity and knew and understood what she was doing when she signed the will. The instrument contained the following attestation clause: "Signed, sealed,

published and declared by the said Mary A. McGrath on the 23d day of September, A. D. 1925, as and for her last will and testament in the presence of the undersigned, who at her request, and in her presence and in the presence of each other, have hereunto subscribed our names as witnesses thereto." The execution of a valid will is under legislative control. The statute has defined what is necessary to accomplish that purpose, and courts cannot dispense with or add to requirements prescribed by the statute. (*Hill* v. *Kehr*, 228 Ill. 204.) Where the preponderance of the evidence shows that the statutory requirements have been complied with the will must be admitted to probate, but unless the preponderance does so show the will can not be admitted. The question of the testatrix's mental capacity to know and understand what she was doing when she signed the will depends in this case mainly upon the testimony of the subscribing witnesses. By the attestation clause signed by them they state the will was signed, sealed and published by the testatrix as her last will and testament, and that they at her request, and in her presence and in the presence of each other, signed as witnesses. An attestation clause has been held *prima facie* evidence of the due execution, and is entitled to due weight in determining whether the will has been legally executed. Under some circumstances the attestation clause may prevail over the testimony of the subscribing witnesses. (*Hart* v. *Hart,* 290 Ill. 476.) An attestation clause, however, is not conclusive. (*Harris* v. *Etienne,* 315 Ill. 540.) The attesting clause signed by the witnesses, in addition to stating the testatrix signed, sealed, published and declared the instrument as her last will and testament, also states that at her request, and in her presence and in the presence of each other, they signed it. We think the proof is very meager, from the testimony of the witnesses, that the testatrix signed and declared the instrument as her last will. It is apparent from the testimony she was in a stupor or state of semi-

consciousness when she signed the instrument, and that she was roused out of her stupor by appellant, who told her it was the will, and asked her if she wanted to sign it the way it had been written up the other night. It was not read to her, and she replied, "Yes." The statute does not require that the will be read over to the person who signs it, before it is signed, but it would not be the will of the person executing it unless he knew its contents. The attestation clause contained no statement that the witnesses believed the testatrix to be of sound mind and memory at the time she signed the will. Lena Frederick testified the testatrix only had half-minute periods of consciousness at a time, and she could not say she had one of those half-minute periods at the time she signed, but during the half-minute periods of consciousness the testatrix knew what she was talking about. Theisen testified appellant, in response to the witness' statement that he wanted to read the will, told him she would not know him and it would not do any good. It is apparent from his description of the testatrix signing the will that she was in a very serious condition, and while the witness said he believed she was of sound mind because she asked to be placed in a sitting posture to sign, he testified that after he had written one letter of his first name the testatrix asked that the will be brought and she would sign it, and that he then had doubts as to her mentality. He went, however, into another room and completed the signing of his name and brought the will back. Both witnesses to the will testified the testatrix never asked them to sign it as witnesses but they were asked to sign it by appellant. Just before signing the will the testatrix had had a sinking spell and it was thought she was dying. We are impressed from the testimony of the witnesses that the testatrix was not in a state of entire consciousness when the will was signed. The manner in which it was signed shows little or no recognition or appreciation

325—14

of what was being done. She was afflicted with diabetes and died about a week later.

Mere weakness from disease at the time of its execution will not render a will invalid if the mind of the person executing it is sufficiently clear that he understands what he is doing. (*McCoy* v. *Sheehy,* 252 Ill. 509; *Campbell* v. *Campbell,* 130 id. 466; *Dowdey* v. *Palmer,* 287 id. 42.) In this case it was competent to prove the mental condition of the testatrix prior and subsequent to the making of the will. Five witnesses in addition to the attesting witnesses testified on behalf of proponent, some of them that the testatrix was of sound mind the day the will was executed, and some of them that before and after that day she was of sound mind. The burden was on the proponent to prove that she had testamentary capacity at the time she executed the will, and we do not think he has sustained this burden. The attestation clause does not state that the witnesses believed the testatrix was of sound mind at the time she executed the will, and it cannot overcome the testimony of the witnesses that they did not believe she was of sound mind or that they had doubts of her being of sound mind. *Britt* v. *Darnell,* 315 Ill. 385.

The proof of the testatrix's condition at the time she signed the instrument shows she was physically very low and unable to write her name. If she was conscious of anything at all she had to be aroused to that state, and soon lapsed back to a state where she apparently did not take notice of or recognize anything. Before we would be authorized to reverse the judgment we must be able to say it was palpably against the weight of the testimony. That we cannot say, and the judgment is affirmed.

*Judgment affirmed.*